SEABOARD COAST LINE RAILROAD COMPANY, SUCCESSOR BY MERGER TO ATLANTIC COAST LINE RAILROAD COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Seaboard C. L. R. Co. v. Commissioner
Docket No. 4870-75.
United States Tax Court
T.C. Memo 1987-615; 1987 Tax Ct. Memo LEXIS 660; 54 T.C.M. (CCH) 1334; T.C.M. (RIA) 87615; December 21, 1987. George K. Dunham,[1] for the petitioner. William R. McCants, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In the statutory notice of deficiency dated March 11, 1975, respondent determined deficiencies in income tax as follows: Taxable Year Ended
Deficiency
12/31/62
$ 2,934,453.66
12/31/63
2,691,573.60
12/31/64
4,570,737.34
12/31/65
3,050,390.64
12/31/66
2,041,424.97
Taxable Period:
1/1/67 to 6/30/67
634,705.22
TOTAL
$ 15,923,285.43
*661 By an amended petition filed March 11, 1982, petitioner claimed additional deductions in each taxable year and period involved attributable to obsolescence of its grading and a tunnel bore, which had not been claimed on returns filed for the taxable years and period in question. Most of the numerous issues set forth in the statutory notice of deficiency and pleadings have been conceded or settled by the parties. There remains for our consideration the following issues: (1) Whether petitioner is entitled to depreciate railroad grading and a tunnel bore; [2] (2) whether petitioner correctly valued salvaged relay rail; and (3) whether petitioner is entitled to losses for the abandonment of ballast. This case has been consolidated with the Louisville and Nashville Railroad Company (docket No. 7249-73) for purposes of briefing and, to a limited extent, for trial. [3] See Louisville & Nashville R.R. v. Commissioner,T.C. Memo. 1987-616. *662 FINDINGS OF FACT General Findings
The parties have entered into stipulations of facts, along with attached exhibits, which we incorporate by this reference. Petitioner, Seaboard Coast Line Railroad Company (SCL), is a successor by merger to Atlantic Coast Line Railroad Company (ACL) and the determined deficiencies concern ACL's premerger taxable years. SCL was a Virginia corporation with Jacksonville, Florida, as its principle place of business at the time of the filing of the petition in this case. ACL was incorporated in Virginia on March 14, 1836, as the Richmond and Petersburg Railroad Company. The "Atlantic" name was established November 21, 1898. In 1900 ACL began acquisition of railroads and other corporations until it was a composite of 82 different corporations and on July 1, 1967, when it was merged with Seaboard Airline Railroad Company, the merged corporation's name was changed to SCL. ACL's corporate income tax returns for the taxable periods in issue were filed with the District Director of Internal Revenue at Jacksonville, Florida. During the taxable periods in issue, ACL was a "Class I" rail carrier regulated by the Interstate Commerce Commission *663 (ICC) and was required to file an annual operating report in accordance with "Annual Report Form A." [4]ACL's books were maintained under the accrual method of accounting and in accordance with the rules prescribed by the ICC in the Uniform System of Accounts for Railroad Companies, 49 C.F.R. 1200 et seq. (1986). Grading and Tunnel Bores
Railroad lines are constructed on right-of-way along strips of land which vary in width from 100 to 400 feet. The roadbed on which the tracks are placed is generally narrower than the right-of-way and constitutes an improvement placed upon land. Grading provides a smooth and shaped roadbed for the tracks and is comprised of open cuts (excavations) and fills (embankments). Grading can also involve clearing and construction of drainage ditches, water channel changes and the sloping of unstable ground. Grading may include excavations to divert streams or embankments to elevate the track above normal ground level. In mountainous areas, it is often necessary to cut away earth *664 from the hillside just above the roadbed and deposit the removed earth just below the roadbed to provide a sufficiently wide level path. Grading expenditures represent the cost of clearing the land, filling the terrain and then smoothing and shaping it to provide a relatively straight and level foundation for the track. Grading costs are carried in ICC Account 3. [5] Grading costs vary depending on the type of terrain, degree of curvature and the degree of roadway incline. The cost of grading is reflected as an "additional or betterment" in completion reports. A completion report is also prepared when grading is retired. Completion reports are numbered to correspond to Authority for Expenditures (AFE) which are project records for additions, betterments and retirements that are approved by appropriate corporate authority. The completion reports, AFE's and ICC inventories constitute the basic accounting records for grading and tunnel bores, as well as other track assets. Tunnels are subsurface structures in the nature of an improvement similar *665 to grading. Tunnel hole construction, consisting of the tunnel and tunnel lining, is separately accounted for under ICC rules and referred to as a "tunnel bore." The cost of digging a tunnel entails earth and rock movement, lining and lighting, all of which are reported in ICC Account 5. Grading and a tunnel bore are assets used in petitioner's operation of a railroad and are considered an integral part of providing transportation service. If a railroad abandons [6] service of one of its lines, grading and tunnel bores (and other track facilities) are generally retired on the railroad's records. A physical inventory was taken of all railroads pursuant to an ICC act where all rail property could be identified on corporate records as well as the book cost, cost of reproduction and cost of reproduction less depreciation, all as of the year 1913. The inventory of ACL *666 was completed in 1917 and since then the inventory has been used for regulatory and tax reporting purposes. The obsolescence of grading and tunnel bores is attributable to physical deterioration and line abandonments because of operating factors and external economic forces. Grading may suffer physical deterioration. The weight of railroad equipment on the tracks and water flowing over and around grading causes physical deterioration to grading. Ballast, which is generally placed upon grading to receive the track structure, may replace grading because of the weight of and upon the ballast. The quality of grading has improved since the nineteenth century. Some nineteenth century grading may have pockets which need improvements. Line abandonments are the largest source of grading retirements. The amount and value of traffic, cost of maintenance and possible public opinion or reaction are considered in any decision to abandon a line. Railroads are built to meet economic needs and markets existing at the time of construction. The rail plant, being fixed in location, is not readily adjustable to shifts in market or geographical demand. The predominant form of transportation *667 prior to railroads was provided by use of bodies of water and navigable waterways. Prior to the 1860's the railroad industry in this country usually provided a link between established water-based transportation. Most of the railroads during this period were of a relatively short distance and were not connected to each other. As population moved west, away from natural and man-made waterways, more railroads were begun, but they were generally special-purpose, short-distance lines within the confines of the jurisdiction (states) which regulated them. As a result, around 1860 most of the railroads were independently owned, unconnected, short lines. Following the Civil War, the railroads expanded and connecting railroads were chartered. Moving into the twentieth century the railroads began to experience competition from the trucking industry which enjoyed increased interstate highway construction into the years in question. In 1925 about 80 percent of inter-city freight was moved by railroads and only about 1 percent by truck. As of 1963 inter-city rail freight had dropped to 43 percent and trucking had increased to 23 percent. Railroad passenger traffic went from more than *668 20 percent of all inter-city travel in 1926 to a little over 2 percent in 1963. Competition, market, geographical factors and other economic forces increased the number of railroad line retirements nationwide. Track system mileage of Class I railroads decreased from 211,459 in 1955 to 196,479 in 1970, a retirement rate approximately 1,000 miles per year. By 1984 Class I railroad mileage fell to 151,998, reflecting a retirement rate approximating 3,000 miles per year during the 1970 to 1984 period. Grading retirements may also be occasioned by conformance to technological advances, new maintenance techniques and attempts to improve efficiency. Examples of these concepts include the use of larger or longer diesel trains, straightening of tracks, and reducing gradients and curves. Tunnels can become obsolete because the height may not accommodate higher profile freight cars. Urbanization may force the retirement and relocation of track. Finally, market demand or competition of railroads with parallel lines may cause mergers which result in abandonment and retirement of redundant lines. ICC accounting rules define property retired as: "units of property which have been removed, *669 sold, abandoned, destroyed, or which for any cause have been permanently withdrawn from service; also minor items of property not replaced." ACL, as it existed during the tax years in question, was a conglomerated company composed of a number of smaller railroads. The track structure, with the exception of a short stretch between Jesup and Folkston, Georgia, was constructed at the beginning of the twentieth or before the end of the nineteenth century. ACL is predominantly a north-south railroad line extending south of Richmond, Virginia, through the central parts of North Carolina, South Carolina, Georgia and down through the middle and west coast of Florida, ending in he southernmost portion of Florida. It extended west to Montgomery, Alabama, and Atlanta, Georgia. The north-south line terrain was relatively flat and generally followed the natural contour which gave rise to some curves and gradients. The western part of the line is more mountainous, creating numerous curves and gradients. Some of the Georgia and South Carolina rights-of-way pass through swampy areas. Soil in the western portion of the line is composed of clay, which is not considered an ideal base for track *670 structure. ACL has engaged in line straightening, gradient reductions and some line realignments. In some cases, lines were moved as much as a quarter of a mile to accomplish these purposes. Realignment and straightening were intended to reduce maintenance costs and to permit trains to move at higher speeds. Some realignment was to remedy poorly constructed grading. Some of the realignment work resulted in the retirement of grading. The central or seminal portion of the ACL railroad line is regarded as the "Richmond and Petersburg" portion which was chartered and originally constructed around 1836. ACL reached its maximum rail mileage in the 1920's. During 1929, one-third of ACL's freight revenue was from agricultural products, which fell to 8 percent by 1962. The reduction is in some part attributable to trucking industry competition. To some extent piggyback operations [7] have helped to counteract the effect of trucking competition. The nature of piggyback operations, however, has resulted in the retirement of spur or branch lines which are no longer necessary to go the situs of production or manufacture of goods. One of ACL's primary passenger markets was to the resort *671 areas of Florida. This passenger revenue was reduced because of alternative means of transportation, such as airlines and automobiles. Following World War II there was increased industrialization in the south which required the use of coal located in eastern Kentucky. This factor caused more emphasis on ACL's east-west, rather than north-south lines, resulting in the retirement of some less useful lines. Urbanization caused the relocation and retirement of lines located in Sanford, St. Petersburg, Tampa and Lakeland, Florida. During the 1950's, ACL considered merging with the Seaboard Airline Railroad to improve service and to better compete with other forms of transportation. These two railroads were to some extent competitive with parallel lines. The merger was effected in 1967 and elimination of some of the parallel lines was projected as a benefit of the merger. ACL experienced six line abandonments involving over 80 miles during the 6-year period preceding *672 the years here in issue. During the years in issue, ACL experienced 12 line abandonments involving over 100 miles. As a result of the abandonments of lines as well as improvements to existing lines, numerous retirements were recorded in ACL's grading account (Account 3). The retirements were recorded at the cost at which the grading had been carried in the grading account. The following reflects the dollar amount additions, retirements [8] and balances in ACL's grading account (Account 3) from 1918 through the years in question: Year
Additions
Retirements
Balance
1967
87,372
3,217
43,272,571
1966
766,150
10,707
43,188,416
1965
248,230
100,598
42,432,973
1964
175,924
76,274
42,285,341
1963
99,380
17,724
42,185,691
1962
400,276
94,439
42,104,035
1961
277,295
221,584
41,798,198
1960
132,890
116,557
41,742,487
1959
80,657
178,446
41,726,154
1958
145,201
21,763
41,823,943
1957
307,012
37,069
41,700,505
1956
480,044
192,944
41,430,562
1955
159,787
50,313
41,143,462
1954
792,557
239,989
41,033,988
1953
498,133
13,132
40,481,420
1952
932,813
252,298
39,996,419
1951
1,257,393
20,370
39,315,904
1950
194,731
229,376
38,078,879
1949
365,931
25,599
38,113,524
1948
173,586
20,277
37,773,192
1947
153,701
8,602
37,619,883
1946
242,676
13,144
37,474,784
1945
146,791
20,726
37,245,252
1944
356,110
10,453
37,119,187
1943
94,936
71,225
36,773,530
1942
70,978
56,109
36,749,819
1941
39,148
95,534
36,734,950
1940
7,964
24,887
36,791,336
1939
10,063
10
36,808,259
1938
41,851
1,031
36,798,206
1937
75,501
23
36,757,386
1936
18,905
96,587
36,681,908
1935
8,254
1,077
36,759,590
1934
6,000
3,588
36,752,413
1933
12,853
474
36,750,001
1932
3,899
11,715
36,737,622
1931
47,898
41,867
36,745,438
1930
304,748
11,784
36,740,407
1929
45,522
14,884
36,447,443
1928
291,564
4,163
36,416,805
1927
802,577
42,668
36,129,404
1926
2,177,836
3,919
35,369,495
1925
1,091,441
1,060
33,195,778
1924
475,029
17,427
32,105,397
1923
473,092
9,571
31,647,790
1922
95,563
99
31,184,269
1921
273,113
4,162
31,088,805
1920
205,703
2,063
30,819,852
1919
205,685
137
30,616,212
1918
462,261
474
30,410,664
*673 The combined tax basis of ACL's grading and tunnel bore was $ 37,878,746 at the beginning of 1962, which includes one tunnel bore which had a cost basis of approximately $ 46,000. In its accounting practices, ACL did not assign a salvage value to grading upon retirement. Where adequate retirement history is available, it may be mathematically converted to survivor ratios which can be compared to established survivor curves reflecting patterned asset life. This method has been called the "actuarial method." It proceeds with the use of a band of existing *674 retirement experience for a period of years. The experience in the known band of years is related to all surviving assets exposed to the risk of retirement. This is accomplished by comparison of the band analysis to the established survivor curves, which based on the limited information will provide a likely pattern of life expectancy. A particular series of survivor curves used for this type of comparison is known as "Iowa curves" because they were developed at Iowa State University [9] and have been used for many years to assist in the projection of life expectancy of long-life assets. The "simulated plant method" (SPR) is a method of life analysis that can be used where there is a limited retirement history. SPR also can be used in connection with Iowa curves. The data required for SPR are the annual gross additions and the annual retirements or asset balances. Actual book balances of retirements and assets are mathematically compared to a selection of survivor curve is achieved. Use of SPR requires less judgment in *675 selection of an appropriate survivor curve than the "actuarial method." The SPR method, by trial and error, duplicates the year-by-year balances of an account by a series of corresponding calculated, or "simulated," balances arising from the assumption that each year's actual additions were retired in accordance with a selected pattern of average life and mortality dispersion (such as Iowa curves). Successive pattern selections are tried until a pattern is found which results in a series of year-by-year calculated balances simulating, as closely as possible, the progression of actual balances. If the calculation does not duplicate the actual account balance history, the calculation is repeated with a different mortality dispersion, assumed life or both. Mr. Paul H. Raab (Raab), of the accounting firm of Ernst and Whinney, possesses expertise in life analyses of long-life assets, with special emphasis on the use of computers to accomplish the life analysis. Raab's professional activity involves his participation in Ernest and Whinney's "utility group," which provides consulting services to regulated industries (utilities), including depreciation studies. Raab considered the *676 physical nature of grading and the forces that bear upon its life expectancy. He met with employees of petitioner and made physical observations of the track structure. He also reviewed the historical data concerning petitioner and railroads in general. After these considerations, Raab decided to use the SPR method because no specific information exists regarding grading and the tunnel bore prior to the ICC record keeping requirements and the inventory completed in 1917. [10] Raab believed the use of SPR to be the most sophisticated analysis technique to effectively process the data available. Raab developed an average date of placement for all dollars of grading prior to 1917. By examining 193 separate railroad segments installed prior to 1917, including the date and placement into service, he derived a weighted average placement *677 date of 1878. A computer program, which included the survivor ratios of the entire family of Iowa curves, was applied to the additions and balances of the grading account in order to simulate the account balances that each Iowa curve would generate from the actual date. Using this computerized approach, five specific Iowa curves that best fit the data were selected. The curve type and historical life estimates selected were, as follows: Curve Type
Life Estimate
L4
124.1
S3
131.9
R5
103.6
S4
109.2
R4
129.2
The five curves were then subjected to three statistical tests to further refine which of the five was most appropriate. A conformance index, [11] retirements experience index [12] and parameter stability test [13] were used to refine the selection to one of the five generated survivor curves. Based upon the above analyses and tests, Raab selected the S3 survivor curve and rounded its life estimate to 132 years. Following the use of the SPR model and selection of the S3 curve, Raab attempted to verify that the curve type and life estimates appropriately represent the mortality characteristics in the grading and tunnel bore accounts for the taxable years *678 in question and to make an assessment of the likely changes that may occur in the mortality characteristics throughout the remainder of the life of the accounts. *679 Verification was accomplished by applying the S3 curve to the sample period (1878 to 1961) and then simulating it for the period 1878 to 1967. The results are compared with the actual balances available and the deviations or differences were tested with the use of Theil's U-statistic (an inequality coefficient) which provides a measure of accuracy on the basis of how well the predictions from the simulation fit the actual amounts. These final verifications reflected an appropriate relationship between the simulated and actual experience. Raab then concluded that several economic and market factors [14] would tend to shorten the 132-year historical life estimate. In concluding his testimony and report, Raab opined that based on all considerations, the grading and tunnel lives will not exceed 130 or be less than 100 years. Raab recommended a 120-year average useful life. Raab's reduction for future economic and market factors was not warranted on this record. *680 Paul H. Reistrup (Reistrup) was offered by respondent to evaluate the underlying documentation for ACL's retirement of grading. Reistrup has had a vast career in the railroad industry, including chief operating officer of Class I railroads. Reistrup identified grading retirement situations which, in his opinion, should not have been included in ACL's grading account as a retirement. Reistrup characterized about 64 percent of the retirements to be "valid," 28 percent "invalid," 7 percent "partially valid" and 1 percent "incomplete." Amongst the type of retirements; condemnations; sales or exchanges with a municipality; and sales to another railroad, factory or a mine. Reistrup's characterizations were not based upon actual observations or discussions with ACL's employees but in most instances from completion reports which Reistrup labeled as containing "insufficient information." [15] The major portion of retirements of grading is attributable to economic, technical and market factors, as opposed to physical wear or deterioration. *681 Respondent offered Nozer D. Singpurwalla (Singpurwalla), a professor at George Washington University with expertise in statistics. Singpurwalla does not perform life analyses of assets, but develops methodology techniques and can evaluate the quality of statistical techniques. Singpurwalla believes that the actuarial method is generally more reliable than the simulated plant method, but that the simulated plant method is "all right" if it reflects reality well. Singpurwalla believes that the simulated plant method could be used to select a survivor curve. Singpurwalla believed that the Iowa curves or simulated plant methods were scientifically exact enough to meet his standards. Respondent also offered another statistical expert, W. Edwards Deming (Deming). Deming, like Singpurwalla, questioned the scientific exactitude of petitioner's life analyses. Petitioner's life analysis by use of SPR to select an appropriate survivor curve, although not scientifically exact, possesses a degree of exactitude sufficient to provide estimates of expected useful life and remaining life of grading when used in conjunction with tests or safeguards to reasonably insure the conformance of available *682 data with the projections or estimates. The average useful life of grading for purposes of this case is 130 years. The average remaining useful life of grading is 75 years, based upon a 1962 average useful life. There is insufficient data available to estimate the average useful life of petitioner's sole tunnel bore. Relay Rail
The valuation of relay or reusable rail for ACL's 1958 through 1961 taxable years was decided in Seaboard Coast Line Railway Co. v. Commissioner,72 T.C. 855, 858-887 (1979), affd. 642 F.2d 1211 (5th Cir. 1981), reh. en banc denied 645 F.2d 72 (5th Cir. 1981). [16] The parties in this case have stipulated that the findings of fact contained on pages 858 through the first two paragraphs on page 861 of Seaboard Coast Line Railway Co. v. Commissioner, supra, are applicable to years now before this Court, with the exception that ACL utilized a $ 50, rather than a $ 25 per gross ton salvage value for the taxable period ending June 30, 1967. The findings stipulated to by the parties are attached to this opinion as Appendix A and incorporated herein by this reference. *683 The life of rail in a track structure is affected by the amount of traffic that passes over it. The life of the rail is also affected by the type of terrain on which it is laid. Traffic passing over the rail creates stress. There are rolling contact stresses which result from the contact of the wheel rolling over the rail; there are bending stresses which are the result of weight of the train on the rail; there are longitudinal forces which result from the normal expansion or contraction of the rail temperature; and there are residual stresses which are locked into the rail either during the rolling or straightening process that are changed with the increased amounts of traffic into the plastic deformation of the rail resulting from that traffic. There is a recognized relationship between the amount of gross ton miles of traffic the rail bears and its service life. Traffic not only generates rail wear, but also brings out the inherent defects in the rail. Rail engineers estimate the range of rail life of 132 pound pattern weight rail to be between 500 million to 1.2 billion gross tons of traffic use, depending upon terrain and whether the rail is welded. Mileage per gross *684 ton (MGT) are averages used for railroad planning purposes. MGT statistics have been kept since the 1940's and are only kept on main lines, which generally have the heavier pattern weight rail. No statistics of MGT are maintained for branch and spur lines, which generally have lighter pattern weight rail. Lighter pattern weight rail would be proportionately longer per dollar expended because all rail prices are based on a per ton basis. [17]
The process for manufacturing rail has improved over the years and modern control-cooled rail of the 1960's was more durable than rail manufactured prior to 1940. Noncontrol cooled rail could be made more effective if welded into greater *685 lengths. Rail of pattern weights of 85 pounds or less was not control cooled. Some portion of the 100 pound rail was not control cooled. Generally new rail is acquired in 39 foot lengths, whereas older 100 pound rail came in 30 and 33 foot lengths. Factors considered in the use of relay rail included pattern weight, rail wear and the cost incurred to make the relay rail reusable. One hundred thirty-one pound rail had a greater rate of failure than 132 pound rail. When 131 pound rail is reused, as welded rail, the ends must be cropped which may result in some reduction in rail weight and size. During the years in issue, the cost of welding rail was about 12 percent of the cost of new rail. The base price [18] of new rail at the mill was $ 115 per net ton and $ 128.80 per gross ton for the period July 20, 1962 through September 16, 1966, and $ 120 per net ton and $ 134.40 per gross ton for the period September 20, 1966 through January 7, 1968. The lowest scrap price for rail was $ 29 in 1965; $ 25.30 in 1966; $ 23.75 in 1967 and $ 21.50 in 1968. *686 Other railroads, for purposes of charging customers, utilized a 60 percent of new unit pricing policy for used rail materials. During 1966 ACL established a "60 percent pricing policy" for used rail to be sold to customers, although ACL used a $ 25 (for 1962 through 1966) and $ 50 (for 1967) salvage value for Federal income tax purposes. ACL purchased about 388 net tons of 112 pound relay rail (in 39 foot lengths) for $ 99 per net ton, or approximately $ 110.88 per gross ton. During 1959 and 1961 ACL priced and listed 112 pound relay rail at $ 75 per gross ton. ACL listed some 131 pound relay rail at $ 84.478 per gross ton during 1961. Relay rail is selected for reuse rather than for scrap purposes and would not justify the additional expense of processing and laying without the potential for a reasonable amount of additional usage. Petitioner's cost of relay rail used for additions was equal to or higher than the cost of relay rail used for betterments. Lighter weight pattern relay rail may have a higher value per ton than shorter, heavier weight pattern relay rail. Respondent determined that the value of petitioner's relay rail during the years and period in issue was $ *687 85. During the years 1962 through 1966 for ACL and 1967 for the conglomerated SCL, the amount, in miles, of main line of rail in use, by pattern weight, as disclosed by Schedule 517 of Form A for each year, was as follows: Pattern
Weight
1st Track
1962
1963
1964
1965
1966
1967
131-132
1,107.06
1,135.56
1,196.77
1,255.54
1,311.15
1,848.79
115
748.10
746.19
747.91
747.99
747.99
1,805.71
112
9.98
9.98
9.98
9.98
9.98
144.21
100
1,501.94
1,478.92
1,418.65
1,366.54
1,335.41
2,728.22
90
.93
.93
.93
.93
.93
319.62
85
1,498.61
1,493.62
1,478.49
1,476.41
1,473.06
1,469.72
80
212.25
209.34
209.44
208.48
208.48
248.68
75
1.17
1.17
1.17
1.17
1.17
191.82
70
322.28
311.28
311.28
307.58
294.15
283.14
60
21.28
21.28
21.28
21.28
21.28
130.17
56
71.70
71.55
71.55
71.55
71.17
68.62
50
0
0
0
0
0
.20
2nd Track
131-132
454.45
393.39
298.91
298.91
290.68
292.90
115
18.83
18.83
18.83
18.83
14.17
74.12
112
0
0
0
0
0
.71
100
7.18
6.15
6.15
6.15
6.15
27.22
85
.83
.83
.19
.19
.19
.19
75
0
0
0
0
0
.04
*688 The net tons of relay rail laid in additions during the years and period at issue are as follows: Pattern
Weight
1962
1963
1964
1965
1966
1967
132
183
223
118
5
5
60
131
1,671
197
110
516
253
38
115
83
41
104
55
99
189
112
0
0
0
0
523
347
100
3,022
1,668
4,067
4,099
6,289
3,658
90
0
0
0
0
8
328
85
1,216
619
829
791
764
584
80
275
40
131
95
146
290
75
14
165
1
0
0
185
70
244
31
369
372
263
120
60
0
0
0
4
1
10
Totals
6,708
2,984
5,729
5,937
8,351
5,809
The net tons of relay rail laid in replacements (including betterments) during the years in issue are as follows: Pattern
Weight
1962
1963
1964
1965
1966
1967
132
9
51
19
21
2,068
2,990
131
9,057
7,066
14,183
15,068
12,468
12,984
115
131
270
210
149
233
414
112
4
0
0
0
1
26
100
2,957
2,781
3,626
5,194
5,391
16,124
90
0
0
0
0
0
431
85
1,002
1,243
1,044
1,184
1,211
1,444
80
162
183
160
202
329
635
75
96
41
0
0
0
278
70
537
356
333
421
334
524
68
0
0
0
0
0
3
65
0
0
0
0
0
3
60
16
3
6
9
0
42
58
0
0
0
0
0
4
2
0
0
15
0
0
Totals
13,973
11,994
19,581
22,263
22,035
35,902
*689 ACL, during the years 1962 through 1966, laid the following gross tons of relay rail in additions and betterments: Year
Additions
Betterments
1962
4,497.32
1,692
1963
2,664.28
2,349
1964
5,115.18
2,208
1965
5,301.77
3,465
1966
6,310.67
2,865
ACL reflected the following amounts of net tons of scrap sold, proceeds received, average net ton, and gross ton prices for scrap on its Form A report to the ICC for the years 1962 through 1966: Average per [19]
Average per
Year
Tons Sold
Proceeds
Net Ton
Gross Ton
1962
732
$  22,187
$ 30.31
$ 33.94
1963
1,846
63,049
34.15
38.26
1964
18,044
493,593
27.35
30.57
1965
8,602
280,330
32.58
36.49
1966
8,235
202,095
24.54
27.48
Respondent utilized two alternative computations for adjustment to ACL's relay rail salvage values. The primary adjustment follows Rev. Rul. 67-145, 1967-1 C.B. 54, *690 in disallowing retirement expenses (where relay rail was from abandoned lines) and adjusts depreciation regarding relay rail salvaged when other rail was laid down. The second part of the adjustment was limited to relay rail salvaged as a result of new rail replacements. As an alternative, respondent utilized the additions and betterments approach of Rev. Proc. 68-46, 1968-2 C.B. 961. An ending inventory adjustment was added to the alternative computation for the short final year ended June 30, 1967. The depreciation disallowances determined by respondent for its primary and alternative positions are as follows: Year
Primary
Alternative
1962
$ 299,680.71
$ 371,359.20
1963
341,332.58
300,796.00
1964
549,661.57
439,390.00
1965
615,766.37
526,006.20
1966
732,536.80
550,540.20
1-1 to 6-30-67
72,774.32
682,000.51
Ballast Issue
ACL accounted for its ballast, during the taxable years and period in issue, pursuant to the retirement-replacement-betterment (RRB) method of accounting. Ballast is part of the track structure, consisting of stone, gravel or other aggregate used to anchor the rail and ties in place. Ballast also provides *691 drainage away from the track and serves as a cushion for the track structure from the effect of the weight of the trains that pass over it. The passage of time and weight of trains passing over the track structure causes physical disintegration or compression into the subgrade beneath the track. Maintenance of ballast by ACL was an ongoing process and standards for ballast were developed. Records were kept of the volume of ballast deposited and utilized between particular mile markers. Ballast utilized to bring the ballast material in place up to standard was charged to capital. Ballast utilized beyond the standard was charged to operating expense. On the average, one-third was charged to capital and two-thirds to operating expense. When ballast was replaced, no salvage value was assigned to the ballast being replaced. When ballast was removed, no value was assigned to it and it was not placed in a materials and supplies inventory. [20] Respondent disallowed [21] ballast costs of $ 188,666.03 for 1962, $ 196,013.95 for 1963 and $ 333,376.19 for 1964. In addition to the cost of ballast disallowed, respondent also disallowed 20 percent of the cost of the ballast as the cost of *692 labor to install it. During the taxable years 1962, 1963 and 1964, due *693 to the retirement of track, some ballast was removed and some was left in place. Over a period of years preceding 1962, a certain amount (estimated to be about 2 percent per year) of the ballast either seeped into the roadbed or deteriorated. Petitioner did not sell the ballast removed and no salvage value was claimed with respect to it. ACL claimed abandonment losses, but the ballast was not thereafter accounted for, even though it may have been used for other applications. ACL did not abandon ballast in the years 1962, 1963 and 1964. OPINION Grading and Tunnel Bore
Petitioner, by means of an amended petition, [22] claimed ratable deductions for anticipated obsolescence of its grading and tunnel bore. [23]Section 167(a)[24] allows a reasonable allowance for obsolescence of property used in a trade or business. Section 1.167(a)-1, Income Tax Regs., provides that "The allowance is that amount which should be set aside for the taxable year in accordance with *694 a reasonable consistent plan (not necessarily at a uniform rate) * * *" over the "estimated useful life of the depreciable property * * *." Sec. 1.167(a)-1(a), Income Tax Reg. Useful life-- is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered * * * are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals and replacements. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used *695 until some time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. * * * [Sec. 1.167(a)-1(b), Income Tax. Reg.]
Normal obsolescence should be taken into account and may render the asset economically useless regardless of its physical condition. Sec. 1.167(a)-9, Income Tax Regs.
*696 We first held that a taxpayer's grading and tunnel bores could be ratably depreciated under section 167 in Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352 (1975). In that case we observed: Unlike physical exhaustion through use which more readily lends itself to empirical study and follows more predictable patterns, exhaustion through obsolescence often defies observation while in progress, succumbing to certainty only in retrospect. This is in part a reflection of the fact that obsolescence is to some extent a function of managerial policy rather than a physical phenomenon. Yet it is clear that, by including obsolescence within the ambit of section 167, the statutory scheme which demands to know the useful life of property prior to its expiration is sufficiently flexible to accommodate some degree of uncertainty and its concomitant inaccuracy. This practical concession to reality was recognized early by the Supreme Court in construing the depreciation provision of the Revenue Act of 1918 ( Burnet v. Niagara Brewing Co., 282 U.S. 648, 654-655): "* * * Neither the cost of obsolescence nor of accruing exhaustion, wear and tear that is *697 properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." [Chesapeake & Ohio Railway Co. v. Commissioner, supra at 379.] The Chesapeake case did not establish, as a rule of law, that all grading and tunnel bores are ratably deductible, but the finding of a 100-year average useful life was based upon that taxpayer's particular facts and circumstances. In subsequent cases we have separately found that taxpayers had shown reasonably ascertainable useful lives for their grading and tunnel bores: Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497 (1980) (100 years for grading and 90 years for tunnel bores); Kansas City Southern Railway v. Commissioner,76 T.C. 1067 (1981) (grading 100 years and tunnel bores 75 years). Our opinions have recognized the inherently flexible nature of the statutory scheme, so that exact precision was not needed for taxpayers to prevail in their positions that grading and tunnel bores are ratably depreciable. All taxpayers need do is establish that *698 these assets have reasonably determinable useful lives. Clearly, "it would be unreasonable * * * to put upon the taxpayer the burden of proving to a reasonable certainty the existence and amount of obsolescence. * * * A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." Burnet v. Niagara Falls Brewing Co.,282 U.S. 648, 654-655 (1931).
Southern Pacific Transportation Co. v. Commissioner, supra at 790-791. Respondent points to a recent Court of Claims opinion where the taxpayer was unsuccessful in proving to the satisfaction of that Court that their grading and tunnel bores had reasonably determinable useful lives. Burlington Northern, Inc. v. United States,676 F.2d 566 (Ct. Cl. 1982) (Burlington). The Court of Claims saw its "task" as "essentially factual in nature." (676 F.2d at 576). The major focus was upon the manner in which the methodology of determining useful life was applied, rather than upon the question of whether grading and tunnel bores were *699 subject to an allowance for depreciation. In Burlington an actuarial method was used resulting in a "stub survivor curve." The curve was "smoothed" and essentially was matched by visual superimposition of Iowa curves over the smoothed stub survivor curve which had been derived from the actuarial analysis. This process requires judgment and the Court of Claims found that "[Burlington] had failed to show that it exercised its judgment properly in selecting the Iowa curve used for its analysis." Burlington at 577. The Court of Claims' holding was premised upon three major findings: (1) The relevancy of "Iowa curves" in determining the useful life of grading and tunnel bores; (2) the subjective quality of the process of selecting the proper curve, which was illustrated by the disparity between the useful lives presented by Burlington's experts; and (3) the lack of verification of the actuarial method by objective means, such as statistical verification procedures. Petitioner in this case did not use the actuarial method, but instead utilized a method where the initial matching of the actual data to a proper fitting curve did not require subjective judgment. Instead, the *700 initial matching was accomplished by simulating the grading account data and, by means of a computer assisted comparison process, matching the data to the entire family of Iowa curves. This process resulted in narrowing the curve selection to the five best fitting curves. Thereafter, the curves were further objectively tested and a single curve was selected with the aid of a limited amount of subjective judgment. The final curve selection process was subjected to numerous objective statistical tests to insure that the simulation and curve selection fits the actual data. We are satisfied that the use of the simulated plant method is warranted and sufficiently accurate to provide a basis for determining the useful life of grading and tunnel bores. The use of this method and the objective verification utilized by this petitioner, factually distinguishes this case from Burlington.
Although the Court of Claims was unable to see the "relevancy of curves [Iowa] reflecting the mortality characteristics of such diverse properties as submarine cable and railroad boxcars in estimating the probable retirement patterns of railroad grading and tunnel bores," (676 F.2d at 577) *701 we are satisfied under this record that the Iowa curves can be effectively utilized in estimating and projecting the useful life of long-life curves. The experts provided by both parties agreed that the Iowa curves could be used to effectively estimate useful life. [25] The Iowa curves, however, have been effectively utilized for asset life analyses and approved by courts for many years. These curves represent a series of life patterns of various industrial assets which were developed at Iowa State University. The curves merely reflect the pattern of property retirements and it should not make a material difference of grading and tunnel bores were or were not included in this particular study. It would seem more important that the pattern of long-life industrial assets be included and represented in the curves. The fifty-year history of the use of Iowa curves and the testimony of the experts have convinced us that use of Iowa curves was appropriate in this case. *702 Respondent has presented the following positions in opposition to petitioner's depreciation claims: (1) Petitioner's attempts to ratably depreciate grading constitutes an impermissible change in the accounting method; (2) petitioner's attempt to depreciate grading constitutes nonallowable distortions of income; and (3) petitioner's depreciation calculations are erroneous because petitioner failed to account for salvage or allowed or allowable depreciation. The change of accounting method was unsuccessfully advanced in Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352 (1975); Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497 (1980); and Kansas City Southern Railway v. Commissioner,76 T.C. 1067 (1981). Respondent requests that we reconsider our holdings in the above cases based upon the facts in this joint record. We find nothing in this record or that of the companion case (Louisville and Nashville case) which would cause us to vary from our prior opinions and we so hold. As to the "distortion" argument, respondent argues that the depreciation of grading for the years in issue would exceed the amount *703 of all prior retirements. [26] We have no way to relate to respondent's argument, because the cost or value of retirements are not indexed and no pattern of retirements is available for comparison. We find respondent's argument to be interesting, but unpersuasive. Respondent's salvage value argument has been addressed in prior railroad opinions. Respondent argues that petitioner has failed to ascertain the salvage value of grading which would have shown that it had a residual value. In Chesapeake & Ohio Railway Co. v. Commissioner, supra at 369, we found that "neither grading nor tunnel bores * * * have any salvage value upon retirement." In this case respondent contends that the retired railroad grading may be used as a roadbed, constitutes an improvement to land regarding improved drainage patterns and retains value in condemnation settings. The evidence presented in the record does not support respondent's contentions. [27] We *704 have found that the majority of grading retirements is due to obsolescence rather than "wear and tear." Based upon the nominal evidence of residual value to railroad grading, we must find, as we did in Southern Pacific Transportation Co. v. Commissioner, supra at 802, "that, on balance, the grading * * * had only a nominal value upon cessation of use, and we conclude that petitioner is justified in its contention herein that the properties at issue would have no salvage value upon their retirement." See Massey Motors v. United States,364 U.S. 92 (1960); sec. 1.167(a)-1(c), Income Tax Regs.
Respondent's "allowed or "allowable" argument advances *705 the position that any of petitioner's pre-1913 depreciation should not be utilized in the depreciable base and that the depreciation that was "allowed or allowable" for post-1913 years, prior to the first taxable year under consideration, should be reduced from the depreciable base. Respondent's rationale is that petitioner could have claimed the depreciation in earlier years. Petitioner points out the paradoxical quality of respondent's position, because it presumes the allowability of depreciation with respect to grading, something which respondent has vigorously argued against. Prior to a line of cases beginning in 1975 with Chesapeake & Ohio Railway Co. v. Commissioner, supra, there was no precedent for a deduction for the obsolescence of grading or tunnel bores. It was only after that opinion that various railroad companies began to claim these deductions. Prior to that time petitioner used the RRB method of accounting. Under that method retirements from the grading account were accounted for at the current cost of reproduction, which would have the same overall effect as depreciation deductions. Furthermore, the retirements have occurred over a period of *706 time to appropriately adjust for inflationary factors. Under these circumstances, we believe that prior depreciation was, in effect, removed from the balance of the grading account. To the extent indicated herein we find this issue for petitioner. Petitioner is entitled to deductions attributable to the obsolescence of grading based upon a 130-year useful life with a 75-year remaining life based upon an 1962 average life. Petitioner is not entitled to any deduction regarding its tunnel bore because there is not sufficient data to determine its useful life. Relay Rail
We have already addressed this same issue for petitioner's 1958 through 1961 taxable years. The parties in this case have adopted and stipulated most of the background and underlying facts directly from our former opinion. In our opinion for the earlier years, Seaboard Coast Line Railway Co. v. Commissioner,72 T.C. 855, 868-887 (1979), we divided our consideration into three components, to wit: "(a) The proper criterion to be employed in valuing reusable or relay rail utilized by petitioner in its track system, i.e., average ledger value, as contended by petitioner, or fair market value, *707 as contended by respondent; (b) assuming the criterion is fair market value, what was that value during the taxable years in question; and (c) the computation of the adjustment based on such fair market value." Although petitioner in this case bemoans the existence of respondent's change in a nearly 50-year position of accepting ledger value as reported to ICC, petitioner presents no arguments or reasons which would cause us to reconsider our analysis supporting the conclusion that fair market value is the proper standard. See Seaboard Coast Line Railway Co., supra at 868-876. Accordingly, we hold for the same reasons set forth in our prior opinion involving petitioner, that fair market value is the proper standard for valuing relay rail. [28]
*708 Concerning the fair market value, petitioner argues, similar to its position in the prior case, that there is no market for relay rail other than the possibility of other railroads' needs. Petitioner goes on to argue that the absence of a market requires the use of a stimulated value based upon the expected MGT of 132 pound rail and the postulations that 131 pound rail is inferior, has shrinkage and additional costs associated with its reuse. Petitioner also contends that 100 pound and lesser pattern weight rail should be valued as scrap. By combining these various assumptions into a formulation developed by one of petitioner's engineer employees, petitioner contends that the fair market value of relay rail (ostensibly over 100 pound pattern weight) is 52 percent of the cost of new 132 pound rail. Applying the percentage to the new cost of 132 pound rail, petitioner arrived at the following proposed values for 131 pound rail: 1962 - $ 66; 1963 - $ 67; 1964 - $ 67; 1965 - $ 67; 1966 - $ 68 and 1967 - $ 70. Respondent points out that we have previously rejected petitioner's simulated approach to estimating fair market value based upon MGT. Further, respondent argues: (1) Petitioner *709 failed to offer a qualified expert on value of relay rail; (2) respondent did offer a qualified expert on the value of relay rail; and (3) petitioner did not offer evidence from its own records of their actual cost of new rail, relay rail bought or sold, or the actual scrap value received during the years under consideration. We agree with respondent. In view of our rejection of petitioner's position and the lack of convincing and probative evidence in support of petitioner's simulated computation in this case, we reject petitioner's proposed values. We now consider whether petitioner has provided sufficient evidence to overcome the presumption of correctness afforded to respondent's determinations that relay rail should be valued at $ 85 during the taxable years and period in issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent, through Rev. Rul. 67-145, 1967-1 C.B. 54, and Rev. Proc. 68-46, 1968-2 C.B. 961, has provided a simplified "rule of thumb" approach to valuing relay rail which was created to avoid the difficulty of converting from railroad accounting methods for Federal income tax purposes. Respondent, *710 in utilizing the simplified method of the revenue ruling and procedure, has sought a method which has been sanctioned in prior cases before this Court. See, for example, Seaboard Coast Line Railway Co. v. Commissioner, supra at 876-878. Respondent has determined that the fair market value of relay rail during the taxable years and period involved is $ 85. [29] In support of that determination, respondent offered Charles E. Whiteside (Whiteside), who is employed as a valuation engineer by respondent, who demonstrated that the computation under Rev. Proc. 68-46, 1968-2 C.B. 961, using the cost of new rail and scrap prices reflected in this record, would produce a higher average value than the $ 85 determined by respondent. Whiteside provided his expert opinion that the fair market value of relay rail during the taxable years and period involved was at least $ 85. In further support of his valuation, Whiteside referenced a survey of relay rail prices which generally reflected prices in excess of $ 85, but also contained "several small transactions in relay rail, all at the price of $ 67.20 per gross ton." As a rule of thumb, Whiteside found several sources *711 that relied upon 60 percent of new value. ACL, on January 6, 1966, for purposes of sale to others, established a second-hand materials price of 60 percent of the new price. *712 Petitioner argues that the revenue procedure method for arriving at fair market value should be expressed as a formula [30] as we had done in Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352, 384-393 (1975), and Kansas City Southern Railway v. Commissioner,76 T.C. 1067, 1139-1142 (1981). In the prior case involving SCL's 1958 through 1961 taxable years, we declined to use the modification contained in the formula approach because "convincing evidence, comparable to that presented in the Chesapeake & Ohio case, that the remaining useful life of rail is directly proportional to its fair market value, has not been presented." We also noted that "automatic use of a formula to arrive at our decision * * * would be inappropriate." Seaboard Coast Line Railway Co. v. Commissioner, supra at 882. In this case, petitioner argues that the formula should be used and that sufficient evidence has been adduced to support use of the formula (which would, of necessity, reduce the fair market value of relay rail.) Respondent argues that, as in the prior case, ACL's rail wear is more gradual than the wear evidenced in the Chesapeake *713 & Ohio case "resulting in more valuable relay rail released from the [petitioner tracks] for equivalent MGT's." Seaboard Coast Line Railway Co. v. Commissioner, supra at 882 notes 27 and 28; Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352, 389 (1975). We agree with respondent and so hold. Respondent, through its employee-expert has provided ample support for the $ 85 valuation and petitioner has failed to overcome the presumption of correctness afforded to respondent's notice of deficiency. We accordingly find that ACL's relay rail had a value of $ 85 per gross ton during the taxable years and period in issue. We next turn to the adjustments connected with the use of the fair market value of relay rail. Respondent, in the notice of deficiency, determined that a value of $ 85, rather than $ 25 or $ 50 used by petitioner, be assigned to relay rail for purposes of *714 computing allowances in lieu of depreciation and/or abandonment losses where relay rail was picked up in retirements. Following the guidance of Rev. Rul. 67-145, 1967-1 C.B. 54, respondent proposed a total of $ 2,611,752.35 in increases to ACL's income for the taxable years and period in issue. In the alternative, respondent proposes $ 2,870,092.11 in increases to ACL's income for the taxable years and period in issue following the guidance of Rev. Proc. 68-46, 1968-2 C.B. 961. The revenue procedure was issued to provide a simplified method of making adjustments to railroad "additions and betterments" accounting approach to pick up relay rail at fair market value. [31] Although respondent utilized the simplified method of the revenue procedure in its alternative computation, it included in ACL's income for its taxable period ended June 30, 1967, an ending inventory of relay rail. The amount of the ending inventory used in respondent's determination was $ 773,070. [32]
*715 Respondent contends that ACL is not entitled to ratably include the so-called "ending inventory" over 20 years as provided in the revenue procedure because "petitioner(s), even after trial of this case, have not complied with the election to abide by the Revenue Procedure." Additionally, respondent contends that petitioner's taxable year ended June 30, 1967, would not qualify under the revenue procedure, because "its terms [do] not extend to that taxable period." Petitioner argues that the 20-year "amortization" of the revenue procedure was permitted by this Court on the same issue involving this petitioner in the earlier case and that respondent cannot pick and choose to follow the approach permitted by the revenue procedure, but must and should follow his own procedures. We agree with petitioner. Rev. Rul. 67-145 and Rev. Proc. 68-46 do not require railroads to make or file written elections prerequisite to their entitlement to use the simplified approach. The approach is available, by the terms of the ruling and procedure, to all railroads as an alternative to actual valuation. The terms of the revenue procedure are interrelated and there is *716 recognition that conversion to respondent's method and fair market value of relay rail presents a one-time inclusion of the cumulative "inventory" of rail. To make summary adjustments to convert the additions and betterments to respondent's method and then include the resultant inventory which had accumulated over a substantial period when the railroad's accepted method of accounting had been used would be unfair and unreasonable. We believe that the revenue procedure fairly addressed this potential distortion by permitting a 20-year ratable adjustment and we hold that respondent's use of the procedure without the 20-year adjustment to be in error. In the literal sense, respondent correctly points out that the revenue procedure and ruling are for taxable years that ended before May 8, 1967. May 8, 1967 is the date which is the publication date of Rev. Rul. 67-145. It is difficult to expect businesses with extensive and geographically dispersed capital and operating assets to begin the process of fair market valuation of rail being picked up on a particular date and to change its accounting and tax related procedures in the middle of a taxable period. In this case *717 the taxable period in question ends less than 2 months from the date of the issuance of the revenue ruling and at least 6 months prior to the issuance of the revenue procedure upon which respondent relies for its computation of fair market value in his alternative position. Under the circumstances of this case, we hold that petitioner's taxable period ended June 30, 1967, should be treated in the same manner as the taxable years 1962 through 1966 for purposes of applying respondent's procedures. [33]
Respondent, in making alternative computations of the adjustments necessitated by the use of fair market value, specified that the alternative computation (the one which is based upon Rev. Proc. 68-46) should be used "In the event it is held that adjustments for reusable rail should be computed on the basis that such rail was used in additions and betterments." [34] Clearly, ACL accounted for "reusable rail" as used in additions and betterments under the RRB method of accounting. We accordingly hold that the procedures of Rev. Proc. 68-46 should be followed, using an $ 85 *718 fair market value for relay rail. Ballast Issue
Petitioner argues that ballast, like track, other track materials and ties, were accounted for under the RRB method of accounting. Under the RRB method no deduction is taken for depreciation, but the full cost of the asset is written off when it is retired without replacement. Respondent, in the statutory notice, determined that petitioner "did not sustain deductible losses from abandonment or retirement of grading, ballast, bridges and other assets left in place when one track of the double track line thereon was retired and not replaced." Petitioner contends that presumption favoring respondent's determination has been overcome by petitioner's "proving that, in fact, the ballast had been removed." Respondent takes the position that his determination is no less effective even if the ballast were removed, because petitioner did not abandon the ballast. The issue is then somewhat refined to the factual question of whether petitioner treated the ballast in the same manner as track, other track material and ties. If not, we must determine whether *719 petitioner intended to abandon the ballast. [35]
Petitioner has relied upon a nonsubstantive factual nuance in the wording of respondent's explanatory paragraph contained in the notice of deficiency. Petitioner would have us decide this issue in its favor merely because it has shown that the ballast was picked up rather than left in place. Respondent's determination disallows the claimed loss on the grounds that the ballast was not abandoned. Respondent has freely admitted on brief that the ballast was removed from its former situs, but continues to argue that petitioner has not shown an intent to or an actual abandonment. Petitioner continues to bear the burden of proving that it is entitled to the loss or expense claimed and it has not done so with respect to the ballast. The record reflects that *720 some ballast was picked up, some was left in place and some portion of it either seeped into the sub-track structure (roadbed) or deteriorated. Additionally, petitioner did not assign a salvage value to the "retired or abandoned" ballast, a requisite to proper accounting under the RRB method, as we explained and considered with regard to the relay rail issue. Moreover, it appears that petitioner does not assign a value to the ballast that may be picked up and reused for purposes of betterment, additions, etc. In view of the foregoing, petitioner has not adequately shown that it is entitled to treat ballast in the same manner as other "track assets" under the RRB method of accounting. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner's failure to show that ballast had been accounted for under the RRB method, leaves us to consider whether petitioner abandoned the ballast. In the prior case we decided that petitioner was not entitled to abandonment losses regarding grading because an intent to permanently abandon the asset, coupled with the act of abandonment had not been shown. Seaboard Coast Line Railway Co. v. Commissioner,72 T.C. at 894; *721 Dezendorf v. Commissioner,312 F.2d 95, 96 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; Boston Elevated Railway Co. v. Commissioner,16 T.C. 1084, 1108 (1951), affd. 196 F.2d 923 (1st Cir. 1952). In this case the ballast was not abandoned but was intended for reuse or left in place. We accordingly hold for respondent on this issue and approve the disallowance of the claimed ballast lost or expense for the taxable years 1962, 1963 and 1964. To reflect the foregoing and various concessions of the parties, Decision will be entered under Rule 155.
Relay Rail Issue FINDINGS OF FACT A railroad's track structure is an asset which is essential to its operation. As applied to ACL, the term "track structure" collectively refers to those assets maintained in the following property accounts prescribed by the Interstate Commerce Commission Uniform System of Accounts for Railroad Companies (49 C.F.R. sec. 1201 (1978)): Account
Property description
3
Grading
8
Ties
9
Rail
10
Other track materials
11
Ballast
12
Track laying and surfacing
Over the years, including those at issue, ACL *722 has made additions to and deletions from its track structure. It has also maintained and upgraded the track structure. Together, these assets comprised the physical structure, exclusive of the land, which supported and guided ACL's trains. In general, these asserts served the following functions: Ties are the cross pieces, usually wooden, which directly support and hold the rail on which the trains roll; other track material refers to the variety of miscellaneous metal components, such as rail joints, bolts, tie plates, spikes and switches, which are used to secure the rails to one another and to the ties as well as for other special purposes; ballast is the crushed rock, gravel, or other granular material forms a suitable foundation for the ties; grading is the preparation of land, by excavation and embankment, to provide a flat and straight base upon which to put the track structure; and track laying and surfacing refers to the labor expense of installing all of the above. The track structure is also classified into main lines, branch lines, yard tracks, and switching and industrial sidings. Main lines are further classified as primary main lines and secondary main lines, *723 depending upon volume of traffic over the line. Branch lines are those portions of ACL track which were constructed to provide a link from a particular area, typically a single shipping point or city, to the main line. Yard and switching tracks are those tracks which are used to marshall and divert trains along ACL's various lines. Industrial tracks are sidings or lead-ins to sidings which serve a specific shipper. During the years at issue, and at all other times here relevant, ACL utilized the retirement-replacement-betterment method of accounting for the assets comprising its track structure (herein referred to as the RRB method). It used this method both for financial accounting and for income tax purposes. [2]
*724 Under the RRB method of accounting, all elements of ACL's original track structure, including rail, were capitalized when placed in service. These assets were maintained on ACL's books at their initial cost. ACL claimed no deductions for ratable depreciation and maintained no reserve for depreciation of these assets during their useful lives. Rather, recovery of the investment in its track accounts, and in particular its investment in rail, was effectuated in the following manner: (1) Retirements. -- When a section of rail was picked up and retired from service without being replaced, the cost of the particular rail as shown in the capital account was charged (debited) to operating expenses. The retired asset was then assigned a salvage value, [3] classified as reusable rail or scrap, and placed in a materials and supplies account at the assigned value. This assigned value for the rail was in turn credited to (and thus reduced) operating expenses. *725 (2) Replacements in kind. -- When a section of rail was replaced in kind, the cost of the replacement rail was charged to operating expenses, and the assigned salvage value of the replaced rail was credited to operating expenses. If the rail laid in replacement was new, its cost as new rail was expensed. If the rail laid in replacement was used, the amount expensed was the assigned salvage value of the used rail as carried on ACL's books. For example, if 85-pound rail was replaced by 85-pound rail, the cost of the replacement rail was expensed, and the value assigned to the replaced rail (as reusable rail or as scrap) was credited to operating expenses. (3) Betterments. -- A betterment ordinarily involves a situation where a section of rail is replaced by a new or used rail having a heavier pattern weight. [4] When replacement of a section of rail involved a betterment, the portion of the cost of the replacement rail if new (or the portion of the assigned salvage value of a used replacement rail) attributable to the increased pattern weight was capitalized, the portion of the cost (or assigned value) attributable to the replacement was charged to operating expenses, and the assigned *726 salvage value of the replaced rail was credited to operating expenses. For example, if a section of 85-pound rail was replaced with 115-pound rail, the amount attributable to the extra 30 pounds was capitalized, and the balance, reduced by the assigned salvage value of the 85-pound rail picked up, was currently expensed. (4) Additions. -- An addition involves the installation of a new line of track or an extension of an existing track. Under the RRB method of accounting, he full current cost of new rail, or the value assigned to used rail, laid as an addition, is capitalized. The theory underlying the application of the RRB method to rail is that all rail in the track structure is deemed to be a single asset, and each individual length of rail *727 is a single component of that asset. Reflective of this theory is the concept of ledger value (stated value or ledger cost) of rail. The ledger value of rail is the initial investment, not including labor, required to place the original rail in service (adjusted for any Interstate Commerce Commission valuation orders), plus the cost of rail applied as additions and betterments subsequent to the date the rail was originally placed in service. Ledger value does not include the cost of replacements since those costs are currently expensed. Rail retirements reduce the track account by the cost of the particular rail retired as shown on ACL's books. The average ledger value of rail is the ledger value of the rail, i.e., the total amount shown in the track account, at any given time, divided by the number of tons of rail in place. The average ledger value per gross ton of ACL's rail during 1958 through 1961 was $ 35.43, $ 35.37, $ 35.04, and $ 34.95, respectively. Relay or reusable rail is rail that ACL had released (picked up or recovered) from a portion of its track structure and was in sufficiently good condition to be relaid in another portion of the track structure. Rail which *728 was picked up but was not in sufficiently good condition to be reused was classified as scrap and sold as scrap metal. During the years 1958 through 1961, and for over 20 years prior to 1958, ACL assigned a value of $ 25 per gross ton to rail released from its track structure as the result of a replacement or retirement. This value was assigned regardless of whether the released rail was classified as scrap or relay rail and was essentially an arbitrary value during the taxable years at issue. When ACL released rail from its track structure, it debited an asset account (material and supplies) $ 25 per gross ton for the rail released, and credited operating expenses in an equivalent amount. When the released rail was reapplied (relaid) in the track structure, it was given the assigned value of $ 25 per gross ton as its "cost" or basis. Upon disposition of scrap rail, generally by sale, the difference between the gross proceeds received from the scrap and its assigned value was either credited against operating expenses (where the proceeds exceeded the assigned value) or debited to operating expenses (where assigned value exceeded the proceeds). This method of accounting was consistent *729 with the financial accounting provisions of the regulations of the Interstate Commerce Commission. Footnotes
1. Attorney George K. Dunham died following the briefing of this case, but before issuance of this opinion. ↩
2. With respect to the depreciation of grading and a tunnel bore, an issue raised by petitioner in an amended petition during 1982, respondent argues that he has been prejudiced for lack of adequate pretrial discovery of petitioner's position. This case began in 1975, was set for trial three times and continued three times by agreement of the parties, after which it was assigned to this division of the Court for trial or other disposition on Aug. 7, 1984. By an amended petition filed Mar. 11, 1982, petitioner raised, for the first time, the question of depreciating grading and a tunnel bore. Respondent, during Aug. 1982, served a Request for Admissions involving issues other than depreciation of grading and a tunnel bore on petitioner, to which petitioner responded during Sept. 1982. A pretrial conference was held on Feb. 20, 1985, and a "pretrial order" was issued Mar. 4, 1985, setting a Nov. 4, 1985, trial date with June 1, 1985, discovery and July 15, 1985, response dates. Further, the parties were to complete and submit a stipulation of facts and filed July 25, 1985, respondent moved for sanctions against petitioner for failure to comply with respondent's discovery and the Court's "pretrial order." Following a hearing, in an order dated Aug. 16, 1985, we noted that both parties were not making satisfactory progress in accord with the Court's "pretrial order" and we denied respondent's motion for sanctions and ordered the parties to exchange the names of witnesses and documentary evidence on or before Sept. 3, 1985. On Aug. 26, 1985, respondent amended his answer to allege that petitioner was collaterally estopped to deny the holding of this Court in a case involving petitioner's earlier years. Thereafter, respondent moved for summary judgment on the collateral estoppel theory, which motion was denied on Nov. 5, 1985, at the trial session. We have already ruled unfavorably on respondent's motion concerning petitioner's alleged intentional dilatory tactics and we reiterate here that respondent has not been prejudiced and had more than adequate time to develop his case. This is especially true where, as here, petitioner has the burden of proof on the issue in question. Respondent's inactivity regarding discovery during the more than 2-year period following the amendment to the petition and prior to the assignment of this case to this division is most damaging to him. It was only after a pretrial hearing and "pretrial order" that respondent even acquired an interest in pursuing pretrial preparation. Rather than prejudice to respondent, we found that the extreme adversary posture of counsel for the parties was, in part, responsible for our issuance of the Aug. 16, 1985, order. Use of the term salvage value in this context is not to be confused with its definition in sec. 1.167(a)-1(c), Income Tax Regs. Rather, its use herein merely denotes the value which is assigned to rail released from the track system. [3]↩ The reports and testimony of certain experts, some stipulated facts and other matters, to the extent appropriate, are being considered applicable in either case. Louisville and Nashville Railroad Company is now part of the Seaboard Coast Line Railroad Company conglomerate, but its petition was filed before it was merged. Although two of the issues presented in these two cases are essentially the same (depreciation of grading and tunnel bores and the value of salvaged relay rail), both issues are essentially factual and are being treated in separate opinions. 4. No report was filed with the ICC for the taxable period ending June 30, 1967, because ACL was merged with SCL and the merged entity filed a full-year report. ↩
5. ICC annual reporting requirements include predefined uniform accounts for the various categories of assets, expenditures, etc. ↩
6. The decision to retire a line from service must be approved by Federal and state regulatory authorities. In considering an application to abandon service, the ICC considers public benefit as well as profitability. The potential for opposition of the public is considered in any decision to abandon a line. ↩
7. Piggyback operations refer to the combined use of trucks and flat-bed railroad cars. Generally, the trucks are driven to a central loading point and the railroad completes the next leg of the journey. ↩
8. Petitioner attempted to remove all CTC retirements from these figures because the actual grading continues in use by the remaining track. CTC is a program where computerized signaling and scheduling permits the railroad to run trains in opposite directions on the same track. This may permit economy in track maintenance where a double track can be reduced to a single one. In the context of this case, CTC conversions resulted in the removal of track structure, for which ICC accounting standards apparently permitted retirements from the grading account even though the grading remained intact and adjacent to the remaining track. ↩
9. Winfrey, Robley, Statistical Analyses of Industrial Property Retirements, Engineering Research Institute, Iowa State University, Ames, Iowa (1935). ↩
10. Completion reports are available with respect to the grading and tunnel bore accounts since 1917. The AFEs (Authorization for Expenditure) which are more detailed than the completion reports and would have been helpful in analyzing the type and reason for a retirement are only available in a limited number of grading retirement situations. ↩
11. A conformance index measures the quality of the fit of the survivor curve to the size of the grading account. The index number is composed of two components: (1) The standard error of the estimate measured as the square root of the average squared difference between the actual and simulated balances; and (2) the average actual balance over the years in question. The conformance index is the ratio of these two components. ↩
12. A retirement experience index measures the degree to which judgment must be used in the selection of the most appropriate survivor curve. This index is composed of the percentage of accumulated retirements of the first year's additions in the account, assuming the selected survivor curve describes the mortality characteristics of the account. ↩
13. A parameter stability test is used to determine the consistency of the survivor curve using different bands of years of experience. The test is accomplished by analyzing different band years of data in which the sum of the squared deviations of actual and simulated balances is minimized to determine the best fitting survivor curve shape and life. ↩
14. Raab's report (Exhibit 77) lists the following factors: (1) Shifts in the economy that favor other forms of transportation; (2) increase in intermodal competition; (3) prior merger resulting in additional future eliminations of duplicate facilities; (4) elimination of unprofitable lines; and (5) the easing of structural barriers to abandonment of lines. ↩
15. CTC retirements were removed by petitioner and there is no direct evidence that any specific retirements was from a condemnation or what effect it would have upon Raab's report, other than respondent's contention that petitioner's data is "contaminated" or "incorrect." ↩
16. The full name of petitioner in that case was "Seaboard Coast Line Railway Co., Successor by Merger to Atlantic Coast Line Railroad Co." ↩
17. Petitioner offered Exhibit 90, which was conditionally received in evidence. The exhibit is a computational analysis of a method of deriving value of relay rail by means of MGT statistics. The exhibit represents the testimony of petitioner's current employee, who was not aware of actual facts and circumstances during the years in issue. Furthermore, said employee did not qualify as an expert in the valuation of track materials. Exhibit 90 is accordingly given no weight in the findings of this case. ↩
18. Without considering "extras," such as the weight of the rail, the absence of shorts, the absence of number two rails, the absence of special drilling, milling, grinding, or treatment, etc. ↩
19. The average price per net ton was derived by dividing the tonnage into the proceeds and the average price per gross ton was derived by converting the net tons to gross tons and dividing that into the proceeds. ↩
20. Petitioner requested that we find that occasionally, under certain circumstances, value was assigned to ballast. Respondent moved and argued at trial that petitioner should not be permitted to advance this factual matter because petitioner had failed to come forward in pretrial discovery with records reflecting and supporting that factual assertion. In essence, respondent claims surprise. We find that the testimony offered by petitioner on this point is insufficient, without documentary and other detailed evidence to make a specific enough finding to have any probative value or bearing on the outcome of this case. We also hold that petitioner was untimely in raising this position in view of our pretrial order and Rule 91. ↩
21. Respondent allowed deductions for the cost of retired rail, other track materials and ties (adjusting the retired rail and other track materials for an increased salvage value) but disallowed the cost of the ballast and grading. During the years in question, petitioner had retired track and deducted the book cost of rail, other track material, ties, ballast and grading. ↩
22. Petitioner did not claim deductions for obsolescence of its grading and tunnel bore on the Federal income tax returns for the taxable years 1962, 1963, 1964, 1965 and 1966 and for the taxable period Jan. 1, 1967 through June 30, 1967. The first case in which ratable deductions of this kind were allowed was Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352↩ (1975). 23. In the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, Congress added sec. 185 permitting railroads a 50-year amortization of grading and tunnel bores placed in service after Dec. 31, 1968. Sec. 185 was amended in the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, permitting amortization after 1974 for grading and tunnel bores acquired prior to 1969. Sec. 185 has no retroactivity to the years before us in this case, nor does it preclude petitioner herein from claiming deductions for years which are no covered by sec. 1985. ↩
24. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years and period in issue. ↩
25. Respondent's expert (Singpurwalla) believed that more advanced and exact statistical methodology has been developed since the development of the Iowa curves (1935). He believed, however, that the simulated plant method, actuarial method and Iowa curves could be used in life analyses. Respondent's expert's concerns with this methodology was the statistical quality of the result. They were dissatisfied with the scientific exactitude of this methodology. ↩
26. Petitioner's historical retirements up to 1967 totaled $ 2,492,134 and it has requested depreciation for the years in issue in the following amounts: $ 911,079, $ 889,496, $ 871,289, $ 854,232, $ 844,415 and $ 418,56[]. ↩
27. Respondent's contentions are no less likely than petitioner's. Petitioner suggests that most of the grading is eventually used as farmland and that the grading in that context is a detriment, rather than being valuable. Respondent envisions condemnations for other purposes, such as a motor vehicle roadbed. In any event, the retirements reviewed in this case do not convince us that respondent's contention should be considered significant enough to change the outcome of this issue. ↩
28. Respondent argues that petitioner is collaterally estopped from rearguing whether ledger or fair market value should be used in valuing relay rail. Without considering the essence of respondent's position, we have in effect reached the same result by our finding that fair market value is the proper standard for the taxable years and period before us. We have, accordingly, rendered no opinion as to whether the doctrine of collateral estoppel applies in this case. ↩
29. In the prior case involving this petitioner or its predecessor, respondent determined and we approved a fair market value of $ 80 for relay rail. Seaboard Coast Line Railway Co. v. Commissioner,72 T.C. 855, 876-882 (1979). Respondent has argued, as he did regarding grading and tunnel bores, that petitioner is collaterally estopped with respect to this issue. We disagree to the extent that the fair market value may have changed or that the revenue ruling or procedure methodology can be shown to be inappropriate or subject to modification. For example see Chesapeake and Ohio Railway Co. v. Commissioner,64 T.C. 352↩ (1975), where we found that modification to the revenue ruling formula was necessary to reflect additional wear occasioned by the terrain of the railroad. To the extent that we have determined that the methodology of the revenue ruling and procedure or the use of MGT in valuing rail is or is not appropriate, the rule of the case is the standard by which we reapply those principles and not by means of collateral estoppel. 30. In Chesapeake & Ohio Railway Co. v. Commissioner, supra at 392, the formula was:
V = .30 (N - .9S) + .9S, where
V = fair market value of relay rail
N = price of rail new
S = price of rail for scrap based on
pattern weight ↩
31. Rev. Proc. 68-46, 1968-2 C.B. 961, 962, contains the following explanation: The Internal Revenue Service recognizes that any adjustments to be made in accordance with Revenue Ruling 67-145, for taxable years that ended prior to May 8, 1967, present complex valuation and accounting problems. Appraisals are not practicable in the case of such reusable railroad track materials because much of such track materials have been reinstalled in track and inspections of such materials in later years would not accurately disclose their fair market values as of the time they were recovered. Identification of previously recorded entries on the books and records, and adjustments thereto, would involve a very difficult and burdensome task. To alleviate these problems, a simplified procedure for making necessary adjustments arising from the application of Revenue Ruling 67-145↩ is provided by this Revenue Procedure. 32. The total relay rail adjustment to income would have been $ 2,097,022.11 without the inclusion of the entire ending inventory of $ 773,070. The revenue procedure calls for inclusion of the "ending inventory" ratably over 20 years. If only 5 percent of the "ending inventory" had been included in ACL's taxable period ended June 30, 1967, the total increase to income under the alternative approach of respondent would have been approximately $ 2,135,675, which is about $ 476,076 less than respondent's primary determination under the revenue ruling. ↩
33. Respondent's rulings and procedures do not have the force and effect of law. ↩
34. It seems to us that all Class I railroads were required by ICC to do so. ↩
35. The unique method of accounting utilized by railroads permits expensing retired and abandoned materials and the assignment of a salvage value to the retired asset, which is reduced from the expense assigned for retirement purposes. Expensing is proper at retirement, because the initial placement (additions and betterments) of the asset is capitalized and not depreciated. ↩
2. In addition to the explanation set forth in the findings of fact herein, the nature and details of this accounting method are further elaborated upon in United States v. St. Louis-San Francisco Railway Co., an unreported case ( E.D. Mo. 1975, 35 AFTR2d 75-1317, 75-1 USTC par. 9395), affd. 537 F.2d 312 (8th Cir. 1976). See also Louisville & Nashville Railroad Co. v. Commissioner, 66 T.C. 962, 993-994↩ (1976), on appeal (6th Cir., June 2, 1978). 4. The pattern weight of a rail is the weight in pounds of a 3-foot length of the rail. Rail is manufactured in 39-foot lengths and various pattern weights. Commonly used pattern weights of rail include: 85-pound, 100-pound, 115-pound, 131-pound, and 132-pound. During the years at issue, the heavier rail generally was used in main lines and lighter rail was generally employed in branch lines, yard tracks, and industrial tracks. ↩